# UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF TENNESSEE
### NASHVILLE DIVISION

| | |
|---|---|
| DONAH MARIE BRADY, | ) |
| | ) |
| **Plaintiff,** | ) |
| | ) |
| **v.** | )  **NO. 3:14-cv-1977** |
| | )  **CHIEF JUDGE CRENSHAW** |
| SOCIAL SECURITY | ) |
| ADMINISTRATION, | ) |
| | ) |
| **Defendant.** | ) |
| | ) |

## MEMORANDUM OPINION

Pending before the Court is Donah Marie Brady's Motion for Judgment on the Administrative Record (Doc. No. 15), to which the Social Security Administration ("SSA") has responded (Doc. No. 18.) Plaintiff did not file a reply to the SSA's response. Upon consideration of the parties' briefs and the transcript of the administrative record (Doc. No. 14),[1] and for the reasons set forth below, Plaintiff's Motion for Judgment will be DENIED and the decision of the SSA will be AFFIRMED.

## I.    Magistrate Judge Referral

In order to ensure the prompt resolution of this matter, the Court will VACATE the referral to the Magistrate Judge.

## II.    Introduction

Plaintiff filed an application for disability insurance benefits ("DIB") under Title II of the Social Security Act on August 15, 2011,[2] alleging disability onset as of June 23, 2011, due to

---

[1] Referenced hereinafter by "Tr." followed by the page number found in bolded typeface at the bottom right corner of the transcript page.

[2] The Act and implementing regulations regarding DIB (contained in Title II of the Act and 20 C.F.R. Part 404 of the regulations) and Supplemental Security Income (contained in Title XVI of the Act and 20 C.F.R. Part 416 of the

TMJ,[3] Bartter Syndrome,[4] and depression. (Tr. 143.) Her claim to benefits was denied at the initial and reconsideration stages of state agency review. Plaintiff subsequently requested *de novo* review of her case by an Administrative Law Judge ("ALJ"). Plaintiff's case was heard on May 2, 2013, when Plaintiff appeared with counsel and gave testimony. (Tr. 27-60.) Testimony was also received from an impartial vocational expert. (Id.) At the conclusion of the hearing, the matter was taken under advisement until July 26, 2013, when the ALJ issued a written decision finding Plaintiff not disabled. (Tr. 13-26.) That decision contains the following enumerated findings:

1. The claimant meets the insured status requirements of the Social Security Act through December 31, 2015.

2. The claimant has not engaged in substantial gainful activity since June 23, 2011, the alleged onset date (20 CFR 404.1571 et seq.).

3. The claimant has the following severe impairments: depressive disorder and anxiety disorder (20 CFR 404.1520(c)).

4. The claimant does not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1(20 CFR 404.1520(d), 404.1525 and 404.1526).

5. [T]he claimant has the residual functional capacity to perform a full range of work at all exertional levels but with the following nonexertional limitations: She can maintain concentration for at least two hours at a time in an eight-hour workday. She can frequently interact with the general public, coworkers and supervisors; and she can adapt to infrequent change in the workplace.

---

regulations) are, substantially identical. Barnhart v. Thomas, 540 U.S. 20, 24 (2003) (noting that the Title II and the Title XVI definition of "disability" is "verbatim the same" and explaining that "[f]or simplicity sake, we will refer only to the II provisions, but our analysis applies equally to Title XVI.") The Court cites to the regulations interchangeably.

[3] Temporomandibular joint and muscle disorders, commonly called "TMJ," are a group of conditions that cause pain and dysfunction in the jaw joint and the muscles that control jaw movement. TMJ Disorders, U.S. Department of Health and Human Services, National Institutes of Health, National Institute of Dental and Craniofacial Research, NIH Publication No. 15-3487 (April, 2015) found at https://www.nidcr.nih.gov/oralhealth/Topics/TMJ/TMJDisorders.htm# (last visited 5/11/17).

[4] Bartter syndrome is a group of very similar kidney disorders that cause an imbalance of potassium, sodium, chloride, and related molecules in the body. Bartter Syndrome, Genetics Home Reference, Lister Hill National Center for Biomedical Communications, U.S. National Library of Medicine, National Institutes of Health, Department of Health and Human Services (May 9, 2017) found at https://ghr.nlm.nih.gov/condition/bartter-syndrome (last visited 5/11/17).

6. The claimant is capable of performing past relevant work as a mattress finisher. This work does not require the performance of work-related activities precluded by the claimant's residual functional capacity (20 CFR 404.1565).

7. The claimant has not been under a disability, as defined in the Social Security Act, from June 23, 2011, through the date of this decision (20 CFR 404.1520(1)).

(Tr. 15, 18, 19, 21-22.)

On September 24, 2014, the Appeals Council denied Plaintiff's request for review of the ALJ's decision (Tr. 1–6), thereby rendering that decision the final decision of the SSA. This civil action was thereafter timely filed, and the court has jurisdiction. 42 U.S.C. § 405(g). If the ALJ's findings are supported by substantial evidence based on the record as a whole, then those findings are conclusive. Id.

## III. Review of the Record

The ALJ then summarized Plaintiff's medical records as follows:

The medical evidence of record cites to the claimant's impairments of Bartters Syndrome and hypopotassemia.[5] The claimant has a history of being noncompliant with taking her prescribed medications dating back to 2007 and as recent as 2010. (Exhibit 2F, pp. 11 and 32). On December 23, 2010, William Littman, M.D., noted in the assessment section of the treatment record that the claimant had been noncompliant and she was aware that she needed to take her pills before her "biggest meal." (Exhibit 2F, p. 11).

On August 1, 2011, the claimant established care at the health department. Brian F. Richey, FNP examined the claimant. She had no motor weakness, and her balance and gait were intact. Neurologically, she was unremarkable. (Exhibit 1l F, p. 13). Treating records show that the normal range for potassium levels is between 3.5 -5.2 mmol/L. On August 8, 2011, laboratory results showed her potassium, serum at 3.9. Laboratory results dated September 13, 2011, revealed potassium levels of 3.3, which was slightly abnormal on this date. (Exhibit llF, p. 6).

---

[5] Hypopotassemia, also called hypokalemia, refers to a lower than normal potassium level in [the] bloodstream. Low Potassium (hypokalemia), Mayo Clinic found at www.mayoclinic.org/symptoms/low-potassium/basics/definition/sym-20050632 (last visited 5/11/17).

On December 30, 2011, the claimant was admitted to the hospital with persistent nausea, vomiting, diarrhea, right flank pain, and increasing weakness. Treatment notes state that her Bartter's Syndrome had resulted in recurrent hypokalemia, which was treated with aggressive potassium replacement as an outpatient. However, she was noted in the emergency department to have a potassium level of 2.1. On admission, she was ordered to take potassium four times a day. Medications also included Magnesium, Zocor, and Prozac 40 [mg.]. She received an infusion of potassium, and two grams of magnesium while at the hospital. William Littman, M.D., a treating physician, diagnosed the claimant with severe hypokalemia, gastroenteritis, history of Bartter's Syndrome, and history of hypercholesterolemia. She was discharged from the hospital on December 31, 2011 once her potassium levels returned to normal. (Exhibit 1OF, pp. 2-5).

The claimant presented to Michael J. Antanaitis, Certified Physician Assistant ("PA-C") from April 2012 to September 2012 for check-ups and refills of medication. Her assessment continued to be Bartter's Syndrome and hypopotassemia during this treatment period. On September 10, 2012, she presented to Mr. Antanaitis with complaints of right foot weakness for about three to four weeks. She reported a diminished ability to dorsiflex her right foot. She also reported left calf cramping. On physical examination, she exhibited weakness of right foot dorsiflexion strength. At this time, Mr. Antanaitis increased the claimant's intake of potassium to five times a day instead of four. (Exhibit 14F).

On April 5, June 4, July 26, and December 17, 2012, the claimant's balance and gait were intact. (Exhibit 14F). Laboratory reports revealed that the claimant's potassium level consistently stayed within normal range. (Exhibit 14F).

As for the physical opinion evidence, Frank Pennington, M.D., reviewed the claimant's file and submitted a consultant analysis on October 7, 2011. According to Dr. Pennington, the severity of the physical impairments alleged by the claimant was inconsistent with the objective findings. Dr. Pennington noted the following impairments: severe hypokalemia, lower extremity weakness, history of Bartter's Syndrome with recurrent hypokalemia, hypertension, and temporomandibular joint disorder. In conclusion, Dr. Pennington found the physical impairments not severe, singly or combined. (Exhibit 4F).

Marvin Cohn, M.D., reviewed the claimant's file and submitted a "Report of Contact" on December 14, 2011. Dr. Cohn did not find additional treatment since the initial assessment by Dr. Pennington. Dr. Cohn noted that the entire "medical evidence of record supports improvement in the claimant's musculoskeletal symptoms/hypokalemic," which was expected with compliant potassium replacement and "no severe or critical exacerbation of hypokalemic muscular symptoms since 2007." As a result, Dr. Cohn affirmed the previous assessment by Dr. Pennington. (Exhibit 7F).

Mr. Antanaitis deemed the claimant able to occasionally lift and/or carry five pounds, and frequently lift and/or carry two to three pounds. For any given eight-hour workday, the claimant could stand/walk for a total of three hours. As for postural activities, Mr. Antanaitis indicated the claimant could occasionally balance, kneel, and crawl, but should never climb, stoop, crouch, or bend. The assessment was based upon the claimant's fatigue and associated hypokalemia. Mr. Antanaitis noted that he had treated the claimant from August 1, 2011 to May 10, 2013. (Exhibit 13F).

Dr. Littman completed a physical capacity evaluation on December 15, 2011. Dr. Littman indicated the claimant could occasionally lift 21 to 50 pounds and frequently lift up to 20 pounds. Dr. Littman determined the claimant could occasionally carry 21 to 50 pounds, and frequently carry up to 10 pounds. For any given eight-hour workday, the claimant could stand for three hours, walk for four hours, and sit for six hours. As for postural limitations, Dr. Littman determined the claimant should never squat, climb, or stoop. However, she could frequently bend, crawl, and reach above shoulder level. According to Dr. Littman, she could withstand moderate exposure to dust and fumes. (Exhibits 9F and 10F, p. 8 - duplicate).

Overall, the evidence notes the claimant's potassium levels have been within normal limits. Her potassium reading was a little below normal on three occasions, but not by very much. The first instance occurred on September 13, 2011, at 3.3. The second instance for a low potassium reading was on December 30-31, 2011, with levels at 2.1 and 2.6 during her hospital course. More than six months elapsed before a third, low potassium reading on July 27, 2012, at 3.1, which was only 0.4 away from being within normal range. Her testimony (discussed below) concerning functional limitations and extreme fatigue is inconsistent with the medical evidence. In August 2011, she had no motor weakness. Her balance and gait are intact throughout the record. As a result, her testimony of sitting for only one hour and standing for 30 minutes is inconsistent with the physical examination findings, which provide insight regarding her true functional capacity.

The claimant was admitted to the hospital only once for low potassium since the alleged onset date of June 23, 2011. In December 2011, she was treated and discharged from the hospital when her potassium level reached normal limits. (Exhibit 10F). The treating records contain no evidence that the claimant has experienced daily fatigue as she has alleged. Treatment records in 2012 showed she consistently had normal balance and gait, and neurologically intact. (Exhibit 14F). The medical evidence of record also reflects that the claimant has a history of being noncompliant with taking her potassium. (Exhibit 2F).

In addition, treatment records revealed the claimant has a diagnosis of chondrocalcinosis[6] degenerative changes in the right knee on June 1, 2009. (Exhibit 12F). However, the medical records did not show that the claimant continued to experience ongoing problems with her right knee. Treatment records revealed the claimant has a normal gait. (Exhibit 14F).

As for the physical opinions, the undersigned gives little weight to the treating medical provider opinions. Dr. Littman determined the claimant could do a range of light work at Exhibit 9F. No clinical and/or laboratory findings or physical examinations by Dr. Littman supported his assessment regarding the standing, walking, sitting, and postural limitations cited in the physical capacity evaluation at Exhibit 9F. In addition, Mr. Antanaitis, a certified physician assistant, deemed the claimant able to perform sedentary work at 13F. These limitations were overly restrictive based upon the entire medical evidence of record. Furthermore, Mr. Antanaitis is not an "acceptable medical source" as defined in the Regulations.

Great weight is given to the opinions of Dr. Pennington and Dr. Cohn, which stated that the claimant's physical impairments are not severe. These opinions are consistent with the medical evidence, which does not support severe physical limitations of the claimant. (Exhibits 4F and 7F). Dr. Cohn even stated how the medical evidence supports improvement in the claimant's musculoskeletal and hypokalemic muscular symptoms, which was expected with compliant potassium replacement.

In sum, the undersigned finds the claimant's Bartter's Syndrome, right knee degenerative joint disease, and hypopotassemia are non-severe impairments, which is supported by the claimant's normal potassium levels and her neurologically intact findings on recent physical examinations.

(Tr. 15–18.)

## IV.     Conclusions of Law

### A.     Standard of Review

This Court reviews the final decision of the SSA to determine whether substantial evidence supports that agency's findings and whether it applied the correct legal standards. Miller v. Comm'r of Soc. Sec., 811 F.3d 825, 833 (6th Cir. 2016). Substantial evidence means

---

[6] Also known as pseudogout is a form of arthritis characterized by sudden, painful swelling in one or more of your joints. These episodes can last for days or weeks. The most commonly affected joint is the knee. Pseudogout, Mayo Clinic found at http://www.mayoclinic.org/diseases-conditions/pseudogout/basics/definition/con-20028152 (last visited 5/11/17).

"'more than a mere scintilla' but less than a preponderance; substantial evidence is such 'relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" Id. (quoting Buxton v. Halter, 246 F.3d 762, 772 (6th Cir. 2001)). In determining whether substantial evidence supports the agency's findings, a court must examine the record as a whole, "tak[ing] into account whatever in the record fairly detracts from its weight." Brooks v. Comm'r of Soc. Sec., 531 F. App'x 636, 641 (6th Cir. 2013) (quoting Garner v. Heckler, 745 F.2d 383, 388 (6th Cir. 1984)). The agency's decision must stand if substantial evidence supports it, even if the record contains evidence supporting the opposite conclusion. See Hernandez v. Comm'r of Soc. Sec., 644 F. App'x 468, 473 (6th Cir. 2016) (citing Key v. Callahan, 109 F.3d 270, 273 (6th Cir. 1997)).

Accordingly, this court may not "try the case de novo, resolve conflicts in evidence, or decide questions of credibility." Ulman v. Comm'r of Soc. Sec., 693 F.3d 709, 713 (6th Cir. 2012) (quoting Bass v. McMahon, 499 F.3d 506, 509 (6th Cir. 2007)). Where, however, an ALJ fails to follow agency rules and regulations, the decision lacks the support of substantial evidence, "even where the conclusion of the ALJ may be justified based upon the record." Miller, 811 F.3d at 833 (quoting Gentry v. Comm'r of Soc. Sec., 741 F.3d 708, 722 (6th Cir. 2014)).

## B.     The Five-Step Inquiry

The claimant bears the ultimate burden of establishing an entitlement to benefits by proving his or her "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A). The claimant's "physical or mental impairment" must

"result[] from anatomical, physiological, or psychological abnormalities which are demonstrable by medically acceptable clinical and laboratory diagnostic techniques." Id. § 423(d)(3). The SSA considers a claimant's case under a five-step sequential evaluation process, described by the Sixth Circuit Court of Appeals as follows:

1) A claimant who is engaging in substantial gainful activity will not be found to be disabled regardless of medical findings.

2) A claimant who does not have a severe impairment will not be found to be disabled.

3) A finding of disability will be made without consideration of vocational factors, if a claimant is not working and is suffering from a severe impairment which meets the duration requirement and which meets or equals a listed impairment in Appendix 1 to Subpart P of the Regulations. Claimants with lesser impairments proceed to step four.

4) A claimant who can perform work that he has done in the past will not be found to be disabled.

5) If a claimant cannot perform his past work, other factors including age, education, past work experience and residual functional capacity must be considered to determine if other work can be performed.

Parks v. Soc. Sec. Admin., 413 F. App'x 856, 862 (6th Cir. 2011) (citing Cruse v. Comm'r of Soc. Sec., 502 F.3d 532, 539 (6th Cir. 2007)); 20 C.F.R. §§ 404.1520, 416.920. The claimant bears the burden through step four of proving the existence and severity of the limitations her impairments cause and the fact that she cannot perform past relevant work; however, at step five, "the burden shifts to the Commissioner to 'identify a significant number of jobs in the economy that accommodate the claimant's residual functional capacity . . . ." Kepke v. Comm'r of Soc. Sec., 636 F. App'x 625, 628 (6th Cir. 2016) (quoting Warner v. Comm'r of Soc. Sec., 375 F.3d 387, 390 (6th Cir. 2004)).

The SSA can carry its burden at the fifth step of the evaluation process by relying on the Medical-Vocational Guidelines, otherwise known as "the grids," but only if a nonexertional impairment does not significantly limit the claimant, and then only when the claimant's characteristics precisely match the characteristics of the applicable grid rule. See Anderson v. Comm'r of Soc. Sec., 406 F. App'x 32, 35 (6th Cir. 2010); Wright v. Massanari, 321 F.3d 611, 615–16 (6th Cir. 2003). Otherwise, the grids only function as a guide to the disability determination. Wright, 321 F.3d at 615–16; see also Moon v. Sullivan, 923 F.2d 1175, 1181 (6th Cir. 1990). Where the grids do not direct a conclusion as to the claimant's disability, the SSA must rebut the claimant's *prima facie* case by coming forward with proof of the claimant's individual vocational qualifications to perform specific jobs, typically through vocational expert testimony. Anderson, 406 F. App'x at 35; see Wright, 321 F.3d at 616 (quoting SSR 83-12, 1983 WL 31253, *4 (Jan. 1, 1983)).

When determining a claimant's residual functional capacity ("RFC") at steps four and five, the SSA must consider the combined effect of all the claimant's impairments, mental and physical, exertional and nonexertional, severe and nonsevere. 42 U.S.C. §§ 423(d)(2)(B), (5)(B); Glenn v. Comm'r of Soc. Sec., 763 F.3d 494, 499 (6th Cir. 2014) (citing 20 C.F.R. § 404.1545(e)).

### C.     Plaintiff's Statement of Errors

As her first claim of error, Plaintiff alleges that the ALJ's finding that her Bartter syndrome was not a severe impairment is not supported by substantial evidence. Plaintiff argues that her Bartter syndrome was a severe impairment and she points to laboratory testing showing low, and occasionally, dangerously low, potassium levels from August 3, 2011, through September 17, 2012. Additionally, Plaintiff argues that the evidence that she was noncompliant

with prescribed treatment preceded the disability onset date and, since that time, there is no evidence in the record to establish that Plaintiff has been noncompliant. Defendant responds that the medical evidence does not support any significant long-term work-related limitations stemming from Plaintiff's Bartter Syndrome. Additionally, Defendant argues that other than Plaintiff's daily medication regimen, there is little evidence that Plaintiff received any treatment that her physician visits were almost entirely routine medication refills or brief visits to check her potassium levels, and that at the vast majority of Plaintiff's physician visits there was no indication that Plaintiff had any muscle cramping or weakness.

The SSA defines non-severe impairments as:

> (a) [a]n impairment or combination of impairments [that] does not significantly limit your physical or mental ability to do basic work activities.

> (b) Basic work activities. When we talk about basic work activities, we mean the abilities and aptitudes necessary to do most jobs. Examples of these include—

>> (1) Physical functions such as walking, standing, sitting, lifting, pushing, pulling, reaching, carrying, or handling;

>> (2) Capacities for seeing, hearing, and speaking;

>> (3) Understanding, carrying out, and remembering simple instructions;

>> (4) Use of judgment;

>> (5) Responding appropriately to supervision, co-workers and usual work situations; and

>> (6) Dealing with changes in a routine work setting.

20 C.F.R. § 404.1521.

Plaintiff has the burden of proving that her impairments are severe. Higgs v. Bowen, 880 F.2d 860, 863 (6th Cir. 1988.) To do so, Plaintiff must offer

objective medical evidence from an acceptable medical source that shows you have a medical impairment(s) which could reasonably be expected to produce the . . . symptoms alleged and that, when considered with all of the other evidence (including statements about the intensity and persistence of your . . . symptoms which may reasonably be accepted as consistent with the medical signs and laboratory findings), would lead to a conclusion that you are disabled.

20 C.F.R. §404.1529(a). Moreover, Plaintiff's symptoms

such as pain, fatigue, shortness of breath, weakness, or nervousness, will not be found to affect your ability to do basic work activities unless medical signs or laboratory findings show that a medically determinable impairment(s) is present. Medical signs and laboratory findings, established by medically acceptable clinical or laboratory diagnostic techniques, must show the existence of a medical impairment(s) which results from anatomical, physiological, or psychological abnormalities and which could reasonably be expected to produce the pain or other symptoms alleged.

20 C.F.R. § 404.1529(b).

As the ALJ noted, the earliest medical records in evidence after the June 23, 2011,[7] onset date are from Plaintiff's August 1, 2011, visit to United Neighborhood Health Service ("UNHS") where she was seen by Family Nurse Practitioner ("FNP") Brian F. Richey. (Tr. 298-304.) At this appointment Plaintiff completed a patient questionnaire which asked whether, over the last two weeks, Plaintiff had experienced any of a list of problems, which included, "feeling tired or having little energy," "trouble concentrating on things, such as reading the newspaper or watching television," and "moving or speaking so slowly that other people could have noticed." (Tr. 298.) Plaintiff checked "not at all" in response to every question. (Id.) Plaintiff was examined by FNP Richey who noted that "[s]he has a rare genetic condition called Bartter's Syndrome where she [has] chronic[ally] low potassium and magnesium levels unless

---

[7] The ALJ also considered Plaintiff's pre-disability onset medical records, largely from visits with Williams J. Littman. M.D., in coming to her determination that Plaintiff's Bartter syndrome was not a severe impairment. (Tr. 15.) Post-disability onset, Plaintiff saw Dr. Littman two more times; once in July, 2011, at which time he noted that Plaintiff had "no insurance" and "no job," and once in September, 2011, to complete Plaintiff's disability paperwork. (Tr. 217-18.)

supplemented." (Tr. 299 (emphasis added).) He conducted a "systems review" and noted that Plaintiff did not complain of fatigue, and all other systems were normal. (Id.) FNP Richey also conducted a physical examination in which, as the ALJ recognized, he noted that Plaintiff had "no motor weakness," her "balance and gait [were] intact," her "coordination [was] intact" and "[n]eurologically, she was unremarkable. (Tr. 15, 300.) FNP Richey ordered lab tests which showed that, despite Plaintiff's normal systems review and physical examination, and despite Plaintiff's denial that she was experiencing fatigue or weakness, Plaintiff's potassium level was low at 2.7 mmol/L.[8] (Tr. 297.) FNP Richey ordered additional lab testing that reflected that on August 3, 2011, Plaintiff's potassium level was normal at 3.9 mmol/L. (Tr. 296), and on September 13, 2011, Plaintiff's potassium level was slightly below normal at 3.3 mmol/L. (Tr. 15, 293).

There are no records in evidence demonstrating that Plaintiff visited the UNHS, or any other medical provider between September 13, 2011, and April 10, 2012, except for a visit to the emergency room at University Medical Center ("UMC") on December 30, 2012, when Plaintiff was admitted overnight with gastroenteritis. Plaintiff's gastroenteritis caused her to have a dangerously low potassium level because she was unable to take her medication. (Tr. 280-84.) She was given intravenous potassium and released the following evening. (Tr. 280.) Despite having such a low potassium level, Plaintiff denied "any palpitations, chest pain or syncope." (Tr. 282.) UMC records note that Plaintiff "was last hospitalized here several years ago with nausea and vomiting at that time." (Tr. 282.) Plaintiff denied any cardiac history, and upon examination she had a normal heart rate and rhythm. (Tr. 282-83.)

---

[8] The normal range for blood potassium levels is 3.5 to 5.2 mmol/L. See Low Potassium (Hypokalemia) located at http://www.emedicinehealth.com/low_potassium/article_em.htm (last visited on 5/15/17).

As the ALJ noted, from April, 2012 through December, 2012,[9] Plaintiff visited UNHS six times and was seen by Michael J. Antanaitis, Certified Physician Assistant ("PA-C"). (Tr. 16, 319-37.) These appointments were generally for the purpose of a check-up, medication refills or lab tests. (See id.) On April 5, 2012, Plaintiff saw PA-C Antanaitis for a check-up and for a refill of her medications. (Tr. 333.) Although Plaintiff's physical examination was normal, including her heart rate and rhythm, and her balance and gait, Plaintiff reported that she was fatigued and lethargic and that she was experiencing generalized weakness and malaise. (Tr. 334.) However, within a few days of this visit, Plaintiff's potassium level was normal at 4.2 mmol/L. (Tr. 289.) Plaintiff saw PA-C Antanaitis on June 4, 2012, for refills of her medication. (Tr. 330.) At this visit, Plaintiff again complained of generalized weakness, fatigue and lethargy, and again the results of her physical examination were normal. (Tr. 330-32.) The record does not contain any lab results from this visit.

Plaintiff next saw PA-C Antanaitis on July 26, 2012 for lab work and a refill on her medications. (Tr. 327.) At this visit, Plaintiff physical examination was normal and she did not report any fatigue, generalized weakness, or lethargy. (Tr. 328.) Notably, her lab results from this visit reflect a potassium level of 3.1 mmol/L., somewhat lower than the normal. (Tr. 337.) On August 27, 2012, Plaintiff saw PA-C Antanaitis for five minutes for a "labs only" visit, however the record does not contain the results of these lab tests. (Tr. 325-26.) Plaintiff saw

---

[9] In a Medical Source Statement, PA-C Antanaitis stated that he treated Plaintiff from August 1, 2011 through March 4, 2013, and possibly thereafter. The record, however, does not contain any recommendation of Plaintiff's visits to the UNHS or any other clinic for treatment after December, 2012. When asked by the ALJ at the May 2, 2013, hearing whether Plaintiff had any additional medical records to admit into evidence, Plaintiff's counsel replied: "No, your honor." (Tr. 30.) Plaintiff's insured status did not expire until December 31, 2015 (Tr. 13), thus the ALJ was free to consider any additional evidence Plaintiff might have offered at or before the hearing. See Carey v. Astrue, No. 11-cv-11010, 2012 WL 1564692, at *6 (E.D. Mich. Apr. 11, 2012), report and recommendation adopted sub nom. Carey v. Comm'r of Soc. Sec., No. 11-11010, 2012 WL 1560475 (E.D. Mich. May 2, 2012) (noting that "while the ALJ generally only considers evidence from the alleged disability onset date through the date last insured, he may also consider later evidence to the extent it relates back the claimant's condition during the relevant period.")

PA-C Antanaitis on September 10, 2012, complaining of "a sudden onset right foot weakness with diminished ability to dorsiflex her right foot."[10] (Tr. 322.) Plaintiff stated that she had "never had this before" and that she fell last week as a result of this right foot weakness. However, Plaintiff had no "back, leg, foot, or ankle pain" or "myalgia."[11] (Tr. 322-23.) Plaintiff also noted that she had some "left calf cramping last week." (Tr. 322.) PA-C Antanaitis examined Plaintiff's extremities and all four were unremarkable with full range of motion, except that Plaintiff's right foot had "passive ROM full." (Tr. 323.) PA-C Antanaitis commented that Plaintiff had "no weakness of [right] thigh/knee dorsiflexion, but weakness of [right] foot dorsiflexion strength." (Id.) PA-C Antanaitis directed Plaintiff to increase her potassium supplementation to one tablespoon five times a day and she was instructed to return in one week to have her potassium level checked. (Tr. 323.) On September 17, 2012, Plaintiff's lab tests reflected a normal potassium level at 3.8 mmol/L. (Tr. 336.)

Plaintiff saw PA-C Antanaitis again on December 17, 2012, for a check-up, refills on her medications and lab work, however the record does not contain the results of these lab tests. At this visit, PA-C Antanaitis noted that Plaintiff was "[n]egative for change in appetite, chills/rigors, decreased activity, fatigue, fever, generalized weakness, increased appetite, irritability, lethargy, malaise, night sweats, and weight loss." (Tr. 320.) Additionally, although PA-C Antanaitis noted that Plaintiff was suffering from "frequent urination, nocturia, urgency,

---

[10] Dorsiflexion means "flexion of the foot in an upward direction." "Dorsiflexion." Merriam-Webster.com. located at https://www.merriam-webster.com/medical/dorsiflexion (last visited 5/16/17).
[11] Myalgia is pain in one or more muscles. "Myalgia." Merriam-Webster.com located at https://www.merriam-webster.com/dictionary/myalgia (last visited 5/16/17).

and urinary incontinence," she was negative for "back pain, change in urine color hematuria or polyuria." (Id.)[12] The remainder of Plaintiff's physical examination was normal. (Tr. 321.)

As the ALJ found, Plaintiff's medical records suggest that her Bartter syndrome was controllable with regular and consistent supplementation. (Tr. 15-18.) Additionally, the record does not contain any medical evidence to suggest that Plaintiff ever suffered from any "functional cardiac abnormalities secondary to potassium imbalance," a consequence of Bartter's Syndrome according to Plaintiff, (Doc. 14 at Page ID# 375), or any other related complications, such as heart or blood problems. See e.g., Arnold v. Autozone, Inc., No. CV 13-1329, 2016 WL 807805, at *3 (E.D. Pa. Mar. 2, 2016) (noting that Plaintiff "suffers from Bartter's Syndrome which affects his kidney functioning and causes related complications to his heart and blood" and that "[d]ue to his medical condition, [Plaintiff] took a leave of absence to have open heart surgery"); McCutcheon v. Hartford Life & Acc. Ins. Co., No. CV 08-04808 RGK (SHX), 2009 WL 1971427, at *1 n.2, *4 (C.D. Cal. July 1, 2009) (noting that "Bartter's Syndrome is an inherited defect in the renal tubules that causes low potassium levels (hypokalemia), low chloride levels, which in turn causes metabolic alkalosis"[13] and that complications of hypokalemia include muscle weakness, syncope, or arrhythmias).

The ALJ considered Plaintiff's testimony regarding the effects of her Bartter Syndrome on her ability to work and found that her testimony "concerning functional limitations and

---

[12] Nocturia mean "urination at night especially when excessive." "Nocturia." Merriam-Webster.com. located at https://www.merriam-webster.com/medical/nocturia (last visited 5/16/17) Hematuria means "the presence of blood or blood cells in the urine." "Hematuria." Merriam-Webster.com located at https://www.merriam-webster.com/dictionary/hematuria (last visited 5/16/17.) Polyuria means "excessive secretion of urine." "Polyuria." Merriam-Webster.com located at https://www.merriam-webster.com/dictionary/polyuria (last visited on 5/16/17).

[13] Metabolic Alkalosis "is caused by too much bicarbonate [base or alkali] in the blood. A condition in which the body fluids have excess base (alkali). "Alkalosis" found at https://medlineplus.gov/ency/article/001183.htm (last visited 5/17/17). Symptoms include "confusion, hand tremor, lightheadedness, muscle twitching, nausea, vomiting, numbness or tingling in the face, hands or feet and prolonged muscle spasms (tetany)." (Id.)

extreme fatigue is inconsistent with the medical evidence." (Tr. 17.) Given the relative paucity of medical evidence, Plaintiff's generally normal physical examinations; the lack of any evidence of substantial complications as a result of Plaintiff's Bartter syndrome; the lack of correlation between Plaintiff's reports of fatigue and weakness with low potassium levels; and Plaintiff's inconsistent reporting of symptoms of fatigue, weakness, or lethargy; the ALJ appropriately determined that Plaintiff's dire testimony about the impact of her Bartter syndrome was not entirely credibly.[14]

The ALJ considered the opinions of Plaintiff's treating medical providers Dr. Littman and PA-C Antanaitis. Plaintiff saw Dr. Littman from 2007-2011, prior to her disability onset date. While under Dr. Littman's care, Plaintiff acknowledged that she was not consistently taking her prescribed medication (Tr. 219, 221), that she had a bad attitude toward her work, and that her work was stressful and was "driving her crazy" (Tr. 219-27.) Notably, many of Plaintiff's visits with Dr. Littman related to her mental health issues (219-23, 226-27) or conditions entirely unrelated to her Bartter syndrome, for example, menopause (Tr. 223) and left shoulder pain after a fall (Tr. 224). On December 15, 2011, several months after Dr. Littman had last examined Plaintiff, Dr. Littman filled out a Physical Capacity Evaluation form in which he opined that Plaintiff had "standing, walking, sitting, and postural limitations." (Tr. 278.) Nevertheless, he remained uncertain as to the impact these limitations might have on Plaintiff's ability to work. (Id.) After reviewing the medical records in evidence from Plaintiff's treatment with Dr. Littman and after considering Dr. Littman's opinion, the ALJ found that Dr. Littman's opinion regarding Plaintiff's physical limitations was not supported by clinical or laboratory findings and gave it little weight. (Tr. 17.)

---

[14] Plaintiff's claim of error regarding the ALJ's credibility finding is discussed below.

With respect to PA-C Antanaitis, who was not an "acceptable medical source,"[15] he opined that Plaintiff had significant work-related limitations because of "fatigue associated with hypokalemia." (Tr. 316-18.) However, having reviewed all the medical records from Plaintiff's six visits with him, the ALJ found that the limitations suggested by PA-C Antanaitis "were overly restrictive based upon the entire medical evidence of record." (Tr. 17.) Indeed, PA-C Antanaitis' opinion regarding Plaintiff's limitations was far more restrictive than the opinion of Dr. Littman, who was an "acceptable medical source." As will be discussed further below, the ALJ did not err in concluding that the opinions of Dr. Littman and PA-C Antanaitis with regard to the limitations caused by Plaintiff's Bartter syndrome were entitled to little weight.

Based on the foregoing, substantial evidence supported the ALJ's determination that Plaintiff's Bartter Syndrome was not a severe impairment. Even assuming *arguendo*, however, that the ALJ erred in not finding that Plaintiff's Bartter syndrome was a severe impairment, such error was harmless under the circumstances present here because in determining Plaintiff's RFC, the ALJ considered all of her impairments, severe and non-severe, and completed the sequential evaluation process. See Maziarz v. Sec'y, 837 F.2d 240, 244 (6th Cir. 1987) (finding that the ALJ considered the limiting effects of all severe and non-severe impairments as a whole, the ALJ's failure to label a non-severe impairment as "severe" was, at worst, harmless error); McGlothin v. Comm'r, 299 F. App'x. 516, 522 (6th Cir. 2008) (finding that it is "legally irrelevant" that the ALJ found an impairment to be non-severe because the ALJ acknowledged the presence of other severe impairments and completed the evaluation process). The ALJ noted that she crafted Plaintiff's RFC "after careful consideration of the entire record." (Tr. 19.) She

---

[15] Acceptable medical sources" include, among others, licensed physicians and licensed or certified psychologists. 20 C.F.R. § 404.1513(a). "Other sources" include medical sources who are not "acceptable" and almost any other individual able to provide relevant evidence. 20 C.F.R. § 404.1513(d).

noted that in making her RFC finding, she was required to "consider all of the claimant's impairments, including impairments that are not severe,"[16] that she "considered all symptoms and the extent to which these symptoms can reasonably be accepted as consistent with the objective medical evidence and other evidence." (Id.) She also considered Plaintiff's testimony at the hearing regarding Plaintiff's perceived physical limitations, and noted that Plaintiff's "medically determinable impairments could reasonably be expected to cause the alleged symptoms, however, [Plaintiff's] statements concerning the intensity, persistence, and limiting effects of these symptoms are not entirely credible. . . ." (Tr. 21.) As such, even if the ALJ should have found that Plaintiff's Bartter syndrome was a severe impairment, her failure to do so was harmless because the ALJ considered Plaintiff's Bartter syndrome, and all other medically determinable impairments, in moving through the sequential evaluation process and crafting Plaintiff's RFC. See Fisk v. Astrue, 253 F. App'x. 580, 584 (6th Cir. 2007) (finding harmless error where the ALJ "'considered limitations and restrictions imposed by all of [Plaintiff's] impairments,' including his non-severe impairments").

As her second claim of error, Plaintiff argues that the ALJ did not evaluate medical opinion evidence consistent with Sixth Circuit precedent or the Social Security regulations. Specifically, Plaintiff alleges that the ALJ erred: (1) in not giving Dr. Littman's opinion controlling weight and in failing to sufficiently explain why Dr. Littman's opinion was not entitled to controlling weight; (2) in not giving PA-C Antanaitis' opinion substantial weight and failing to sufficiently explain why; and (3) in improperly giving greatest weight to the opinions

---

[16] Citing 20 C.F.R. § 404.1545, which provides that "[w]e will consider all of your medically determinable impairments of which we are aware, including your medically determinable impairments that are not 'severe'" and SSR 96-8p, which provides that "[i]n assessing RFC, the adjudicator must consider limitations and restrictions imposed by all of an individual's impairments, even those that are not 'severe.'" SSR 96-8p, 1996 WL 374184, at * 5 (July 2, 1996).

of non-treating, non-examining, sources, Frank Pennington, M.D., and Marvin Cohn, M.D.[17] In opposition, Defendant claims that substantial evidence supports the ALJ's RFC finding and notes that the ALJ assigned little weight to the opinions of Dr. Littman and PA-C Antanaitis because the evidence in the record did not support the level of limitation described in their opinions.

Social security regulations and rulings establish the framework for the ALJ's consideration of medical opinions. See 20 C.F.R. §§ 404.1527, 416.927; SSR 96-2p. Acceptable medical sources are divided into three categories: treating sources, examining but non-treating sources; and non-examining sources. As explained above, a treating source "means your own acceptable medical source who provides you, or has provided you, with medical treatment or evaluation" consistent with accepted medical practice, and "who has, or has had, an ongoing treatment relationship with you." 20 C.F.R. § 404.1527. An examining, but "nontreating source . . . has examined the claimant but does not have, or did not have, an ongoing treatment relationship with h[im]." Smith v. Comm'r of Soc. Sec., 482 F.3d 873, 875 (6th Cir. 2007) (internal citation and quotation marks omitted). A "nonexamining source is a physician, psychologist, or other acceptable medical source who has not examined [the claimant] but provides a medical or other opinion in [the claimant's] case." Id. (internal citation and quotations marks omitted).

"When evaluating medical opinions, the SSA will generally give more weight to the opinion of a source who has examined [the claimant] than to the opinion of a source who has not examined her]." Id. (internal citations and quotations marks omitted). However, the SSA is only required to "give good reasons in [its] notice of determination or decision for the weight [it gives

---

[17] Because Plaintiff does not take issue with the ALJ's examination of the mental health opinion evidence, those opinions are not discussed here.

19

the claimant's] treating source's opinion." <u>Ealy v. Comm'r of Soc. Sec.</u>, 594 F.3d 504, 514 (6th Cir. 2010) (internal citation omitted). Indeed, the Sixth Circuit has long held that the that "the regulation requiring an ALJ to provide 'good reasons' for the weight given a treating physician's opinion does not apply to an ALJ's failure to explain his favoring of one non-treating source's opinion over another." <u>Wright v. Colvin</u>, No. 1:15-cv-01931, 2016 WL 5661595, at *9 (N.D. Ohio Sept. 30, 2016) (citing <u>Kornecky v. Comm'r of Soc. Sec.</u>, 167 F. App'x 496, 506-07 (6th Cir. 2006). Likewise, the ALJ is "under no special obligation" to provide great detail as to why the opinions of the nonexamining providers "were more consistent with the overall record" than the examining, but nontreating providers. <u>Norris Comm'r of Soc. Sec.</u>, 461 F. App'x 433, 440 (6th Cir. 2012). As long as "the ALJ's decision adequately explains and justifies its determination as a whole, it satisfies the necessary requirements. . . ." <u>Id.</u>

The ALJ amply explained why she accorded the opinions of nonexamining sources, Drs. Pennington and Cohn, greater weight than the opinions of treating sources, Dr. Littman and PA-C Antanaitis. As noted above, Dr. Littman submitted a "Physical Capacity Evaluation" form. (Tr. 278.) This document is a "check-off form" with room at the bottom for comments. (<u>Id.</u>) Dr. Littman endorsed a variety of restrictions, including prohibitions against squatting, climbing or stooping, and sitting, walking and standing limitations. (<u>Id.</u>) Dr. Littman did not offer any comments or explanations to support the limitations that he checked on the form. (<u>Id.</u>) Notably, when asked whether Plaintiff could work an 8 hour day and the number of breaks Plaintiff might require in an 8 hour day, Dr. Littman responded, "uncertain," and where the form asked if Plaintiff would need to lie down or put her feet up during the work day he responded, "no." (<u>Id.</u>) As the ALJ noted, the medical evidence in the record, and in particular, Dr. Littman's own treatment records, did not support the limitations he endorsed. (Tr. 17.)

As explained above, most of Plaintiff's visits with Dr. Littman concerned her mental health issues or injuries unrelated to her Bartter syndrome. (Tr. 217-23.) Additionally, where Dr. Littman did note information about Plaintiff's Bartter syndrome, that information related to admonishing Plaintiff for being non-compliant with, and failing to consistently take, her potassium medication. (Tr. 219, 221.) Moreover, Dr. Littman endorsed limitations that do not appear to be based on impairments he identified or treatment he provided to Plaintiff. For example, Dr. Littman endorsed squatting, climbing, and stooping limitations, but his treatment notes fail to substantiate functional limitations related to Plaintiff's hips, knees, or back. Likewise, Dr. Littman noted that in an 8 hour work day, Plaintiff could sit for 6 hours, stand for 3 hours, and walk for 4 hours, but again there are no treatment notes to support these limitations and Dr. Littman does not explain what evidence prompted him to endorse these limitations. As such, and based on the record evidence, the ALJ did not err in giving little weight to Dr. Littman's opinion, contained in the Physical Capacity Evaluation "check-off form." See Ellars v. Comm'r of Soc. Sec., 647 F. App'x 563, 566-67 (6th Cir. 2016) (finding that ALJ did not err in not giving significant weight to treating physician opinion where the opinion consisted of a two-page Physical Capacity Evaluation form, without any explanation or citation to clinical test results, observations, or other objective findings); Rogers v. Comm'r of Soc. Sec., No. 99–5650, 2000 WL 799332 (6th Cir. June 9, 2000) (treating physician's documentation of impairments on form with checked-off boxes was not entitled to great weight when no further explanation given); see also 20 C.F.R. § 404.1527(c)(3)("The better an explanation a source provides for an opinion, the more weight we will give that opinion.")

PA-C Antanaitis also did not support the limitations he set out in the Medical Source Statement "check-off form" with any objective medical evidence. (Tr. 315-18.) PA-C

Antanaitis opined, by checking the appropriate box, that Plaintiff could not work, that she would need to lie down during the work day, and that she had difficulty concentrating, remaining attentive, and following or remembering directions. (Id.) Additionally, PA-C Antanaitis opined that Plaintiff could stand or walk for a total of 3 hours, that sitting was not impacted by Plaintiff's impairment, and that Plaintiff would have to rest for 2 hours during an 8 hour work day. (Id.) PA-C Antanaitis noted reaching, pushing, and pulling as physical limitations and he endorsed the following environmental restrictions: heights, moving machinery, temperature extremes, chemicals, dust, fumes, humidity, and vibration, although he did not endorse a noise restriction. PA-C Antanaitis explained that he endorsed such a wide-range of restriction based on Plaintiff's fatigue associated with hypokalemia. (Id.) He elaborated that "hypokalemia causes balance, fatigue, and muscle cramping issues, along with dizziness." (Tr. 318.) As the ALJ noted, the limitations identified by PA-C Antanaitis "were overly restrictive based upon the entire medical evidence of record." (Tr. 17.)

As explained above, throughout Plaintiff's treatment with PA-C Antanaitis, her reports of weakness and fatigue, often did not match with lab results showing low potassium. (See e.g., Tr. 336-37.) Additionally, at several visits, in particular after PA-C Antanaitis increased Plaintiff's potassium dosage, Plaintiff reported no weakness or fatigue. (Tr. 320, 328.) Little, if anything, in PA-C Antanaitis treatment notes suggest that Plaintiff had any difficulty with balance, except for the single exceptional visit in which Plaintiff experienced right foot weakness which was resolved after PA-C Antanaitis increased Plaintiff's potassium prescription. (Tr. 322-24.) Likewise, nothing in the medical records supports the reaching, pushing, and pulling restrictions, or environmental restrictions that PA-C Antanaitis identified. Indeed, Dr. Littman opined that Plaintiff had few of the restrictions that PA-C Antanaitis identified. (Compare Tr. 278, 315-18.)

Looking at the record as a whole, there was ample evidence to support the ALJ's decision to give little weight to PA-C Antanaitis opinion because it was not supported by the objective medical evidence. Moreover, the ALJ adequately explained her reasoning for giving PA-C Antanaitis opinion little weight, but even if she did not, SSA rules only required that she "ensure that the discussion of the evidence in the determination or decision allows a claimant or subsequent reviewer to follow [her] reasoning. SSR 06-03P, 2006 WL 2329939 (Aug. 9, 2006) The ALJ carefully considered PA-C Antanaitis treatment notes and his Medical Source Statement, before determining that PA-C Antanaitis's opinion was entitled to little weight. The ALJ sufficiently fulfilled her obligations. (Tr. 16-17.)

With respect to the ALJ's decision to give great weight to the opinions of Drs. Pennington and Cohn, the ALJ explained that neither Dr. Pennington nor Dr. Cohn found that Plaintiff had severe physical impairments and she concluded that their "opinions are consistent with the medical evidence, which does not support severe physical limitations of the claimant." (Tr. 18.) Moreover, she noted that Dr. Cohn opinioned that Plaintiff's compliance with potassium replacement would be expected to improve her condition. (Tr. 18, 276.) The ALJ did not err in crediting the opinions of Drs. Pennington and Cohn, where, as here, the medical evidence of record supported their opinions and failed to support the opinions of the treating providers. See Norris, 461 F. App'x at 439 (explaining that "[a]ny record opinion, even that of a treating source, may be rejected by the ALJ when the source's opinion is not well supported by medical diagnostics or if it is inconsistent with the record").

As her third claim of error, Plaintiff argues that the ALJ's finding that she could perform jobs identified by the VE is not supported by substantial evidence. This argument is based on the ALJ failure to properly credit Dr. Littman's and PA-C Antanaitis' opinion regarding Plaintiff's

limitations. Specifically, Plaintiff claims that the ALJ failed to present, in her hypotheticals to the VE, all of the limitations identified by Dr. Littman and PA-C Antanaitis. However, in crafting hypothetical questions, the ALJ only need incorporate those limitations that she finds credible and well supported by the medical evidence as a whole. See Winslow v. Somm'r of Soc. Sec., 566 F. App'x 418, 421 (6th Cir. 2014) (noting that the "record reflects . . . that the hypothetical questions were proper because the ALJ incorporated all of the functional limitations that she deemed credible"). Moreover, the ALJ may omit from her hypothetical question, any non-severe impairments. See Griffiths v. Comm'r of Soc. Sec., 582 F. App'x 555, 565 (6th Cir. 2014) (finding that because Plaintiff's impairment "was not determined to be 'severe,' the ALJ was not required to reference it in his hypothetical question" to the VE). The ALJ framed appropriate hypothetical questions based on limitations she found credible and, as such, she was entitled to rely on the VE's testimony that Plaintiff could perform her past work. See Anderson v. Comm'r of Soc. Sec., 406 F. App'x 32, 35 (6th Cir. 2010) (noting that [a]s long as the VE's testimony is in response to an accurate hypothetical, the ALJ may rely on the VE's testimony to find that the claimant is able to perform a significant number of jobs").

As her fourth claim of error, Plaintiff argues that the ALJ did not adequately explain the basis of her finding on Plaintiff's credibility. The ALJ, not the court system, is tasked with evaluating a witness' credibility; credibility findings must be "grounded in the evidence and articulated in the determination or decision." SSR 96-7P, 1996 WL 374186 at *4 (July 2, 1996); Rogers v. Commissioner, 486 F.3d 234, 247 (6th Cir. 2007). In addition to the objective evidence, the ALJ should consider the following factors when assessing the credibility of a claimant's statements regarding his symptoms:

1.     The individual's daily activities;

2. The location, duration, frequency, and intensity of the individual's pain or other symptoms;

3. Factors that precipitate and aggravate the symptoms;

4. The type, dosage, effectiveness, and side effects of any medication the individual takes or has taken to alleviate pain or other symptoms;

5. Treatment, other than medication, the individual receives or has received for relief of pain or other symptoms;

6. Any measures other than treatment the individual uses or has used to relieve pain or other symptoms (e.g., lying flat on his or her back, standing for 15 to 20 minutes every hour, or sleeping on a board); and

7. Any other factors concerning the individual's functional limitations and restrictions due to pain or other symptoms.

SSR 96-7P, 1996 WL 374186 at * 3.  Under SSR 96–7p the ALJ is required to "consider" the seven listed factors, but there is no requirement that the ALJ discuss every factor.  See White v. Commissioner, 572 F.3d 272, 287 (6th Cir. 2009); see also Coleman v. Astrue, No. 2:09–cv–36, 2010 WL 4094299, at * 15 (M.D. Tenn. Oct. 18, 2010) (finding that "[t]here is no requirement [ ] that the ALJ expressly discuss each listed factor"); Roberts v. Astrue, No. 1:09–cv–1518, 2010 WL 2342492, at * 11 (N.D. Ohio June 9, 2010) (finding that "the ALJ need not analyze all seven factors contained in SSR 96–7p to comply with the regulations").  Nevertheless, the Sixth Circuit recognizes that meaningful appellate review requires more than a blanket assertion by an ALJ that "the claimant is not believable." Rogers, 486 F.3d at 248.  The Rogers court observed that Social Security Ruling 96–7p requires that the ALJ explain his or her credibility determination and that the explanation "must be sufficiently specific to make clear to the individual and to any subsequent reviewers the weight the adjudicator gave to the individual's statements and the reasons for that weight." Id.

25

The ALJ considered the factors set forth in SSR 96-7p in her summary of Plaintiff's testimony at the hearing. (See Tr. 18-21.) The ALJ noted that Plaintiff engaged in extensive activities of daily living, including preparing meals and performing household chores such as cleaning, and doing the laundry and ironing. (Tr. 18.) Additionally, Plaintiff had no problems with personal care, including dressing herself, caring for her hair and shaving, nor did she have any difficulty driving. (Id.)

The medical evidence established that Plaintiff's physical examinations were largely normal, and she had no motor weakness, her balance and gait were intact, her heart rate and rhythm were normal, she denied chest pain, palpitations or fainting. (Tr. 319-35.) Moreover, Plaintiff was admitted to the hospital only one time during the period in question because a bout of gastroenteritis rendered her unable to take her prescribed medication. (Tr. 17.)[18]

The ALJ noted that although Plaintiff was given psychotropic mediation by her primary care provider, Plaintiff did not see a mental health provider and the record disclosed no treatment notes or treating sources statements from any mental health providers, except for the agency consultants.

After reviewing all of the objective medical evidence and considering Plaintiff's testimony in light of such evidence, the ALJ found that Plaintiff's "testimony concerning about

---

[18] Although Plaintiff acknowledges that the "treatment" for Bartter syndrome "consists of keeping the blood potassium at a normal level, which is done primarily by having a diet rich in potassium and taking potassium supplements, if necessary, (Doc. No. 16 at Page ID# 375-76), she appears to argue that merely having a Bartter syndrome diagnosis is sufficient to establish disability. This is simply false. As noted above, Bartter syndrome can result in a number of physiological impairments related to the heart and blood, fainting, arrhythmia, confusion, and numbness, and Plaintiff does not allege that her Bartter syndrome has caused her to experience any of these conditions. Rather, Plaintiff contends that her fatigue and weakness are the result of her Bartter syndrome. However, the evidence in the record establishes that Plaintiff's reports of fatigue and weakness are inconsistent and do not always match up with her having low potassium levels, but indeed are also evidence of depression, which the ALJ found to be a severe impairment. (See e.g. Targum, Steven D., and Maurizio Fava. "Fatigue as a Residual Symptom of Depression." Innovations in Clinical Neuroscience 8.10 (2011): 40–43 located at https://www.ncbi.nlm.nih.gov/pmc/articles/PMC3225130/ (last visited 5/22/17)).

"the intensity, persistence, and limiting effects of [her] symptoms" was not "entirely credible." (Tr. 21.)

The ALJ's credibility finding is supported by substantial evidence and she sufficiently explained the reasoning behind her determination.

Based on the foregoing, the ALJ's decision that Plaintiff's mental and physical impairments were not disabling is supported by substantial evidence on the record as a whole. Accordingly, the ALJ's decision will be affirmed.

## V.    Conclusion

In light of the foregoing, Plaintiff's Motion for Judgment on the Administrative Record will be DENIED and the decision of the SSA will be AFFIRMED.  An appropriate order is filed herewith.

_____
WAVERLY D. CRENSHAW, JR.
CHIEF UNITED STATES DISTRICT JUDGE